[File No. 6287.]

WARD COUNTY, NORTH DAKOTA, a Public Corporation, Respondent, v. MILFORD ANKENBAUER and Angelia Ankenbauer, et al., and Burke County, North Dakota, a Public Corporation, Appellant.

(257 N. W. 474.)

Opinion filed November 19, 1934.

*Earl Walter,* for appellant.

*Robert W. Palda,* State's Attorney, and *C. E. Brace,* Asst. State's Attorney, for respondent.

CHRISTIANSON, J. This is a proceeding, under § 14, chapter 97, Laws 1933, for the removal of a person "who is likely to become a public charge, or who has become a public charge . . . found in any county other than that of his legal residence." This statute, so far as material here, reads as follows:

"Whenever any poor person, who is likely to become a public charge, or has become a public charge, is found in any county other than that of his legal residence, the overseer of the poor may, in case such poor person refuses to voluntarily go to the county of his legal residence, make application to the district court for an order directed to such poor person and to be executed by the sheriff, cause any such poor person to be sent and conveyed at the expense of the county to the place where such poor person belongs, if the same can be conveniently done; . . . Such application for an order of removal to the district court shall be made upon written notice and order to show cause served upon such poor person and such poor person shall be entitled to a hearing thereon before an order of removal is issued." Laws 1933, c. 97, § 14.

The application involved here is made by Ward county, and Burke county is made a party to the proceeding as it is claimed that that county is the legal residence of Milford Ankenbauer and Angelia Ankenbauer, the persons who are sought to be removed from Ward county. The case came on for trial and both Ward county and Burke county appeared by their respective state's attorneys. The only witnesses who were examined were the defendant Milford Ankenbauer and the state's attorney of Burke county.

The state's attorney of Burke county testified as follows:

"Q. You are the State's Attorney of Burke county? A. Yes. Q.

Do you know whether or not Burke county as a county has been giving any poor relief to anyone in the last year? A. So far as I know, Burke county has been giving aid in the form of medical services only. Q. And they have relied for poor relief in general upon this Federal aid that has been given out throughout the State, have they not? A. As I say we have given help to that extent. I don't know of any other. I am not in a position to definitely answer that question. Q. You know the Federal government has a relief station in Bowbells and they are giving relief? A. Yes."

It is not necessary to relate the testimony of Ankenbauer. His testimony related to matters not in dispute and is epitomized in the findings of fact hereafter set forth.

Upon the trial it was stipulated:

"That the poor relief in Burke county furnished to the defendants Ankenbauers was all furnished by the Federal Government since October 1, 1933, and that the county commissioners of Burke county as overseers of the poor furnished no aid to any of the Ankenbauers in Burke county other than for medical services."

It was also stipulated:

"It is understood by counsel present that the only issue in this case now is what the relationship is between the county commissioners of Burke county as overseers of the poor and the federal aid furnished to these defendants. The other issues in the case are all resolved in favor of Ward county should the Court decide that the aid furnished by the government was aid furnished by Burke county."

The trial court, among others, made the following findings of fact:

"That said defendants, Milford Ankenbauer and Angelia Ankenbauer, are husband and wife, and are now living in said Ward county.

"That for a number of years said husband and wife lived upon their farm in said Burke county, removed therefrom to the village of Columbus, in said Burke county, and that they removed therefrom to Ward county, sometime during the month of November, 1932.

"That said husband and wife were compelled to seek poor relief in the month of October, 1933, and received poor relief from said Burke county by and through the Federal Relief Administration in said Burke county in the month of October, 1933, and continuously thereafter to and including the month of May, 1934.

"That during the month of April, 1934, said husband and wife applied for poor relief in said Ward county."

The case involves a construction and application of the following provisions of chapter 97, Laws 1933: § 4. "Residence may be acquired in any county so as to oblige such county to relieve and support the persons acquiring such residence in case they are in need of relief, as follows: 1. The residence of a married woman follows that of her husband if he has any within the state, . . . 4. Each male person and each unmarried female over the age of twenty-one years, who shall have resided one year continuously in any county in this state, shall thereby gain a residence in such county. Each minor whose parents, and each married woman whose husband has no residence in this state, who shall have resided one year continuously in the state, but not in any one county, shall have a settlement in the county in which he has longest resided within such year. Every minor not emancipated and settled in his own right shall have the same settlement as the parent with whom he has last resided. The time during which a person has been an inmate of a hospital, poorhouse, jail, prison or other public institution and each month during which he has received relief from the poor fund of any county, shall be excluded in determining the time of residence hereunder. . . . 6. Each residence when once legally acquired shall continue until it is lost or defeated by acquiring a new one in this state, or by voluntary absence from the county in which such residence had obtained for one year or more; and upon acquiring a new residence, or upon the happening of such voluntary absence, all former residence shall be defeated and lost, and the provisions of this section shall apply to cases of residence begun to be acquired or lost or defeated, as well heretofore as hereafter. Provided, that if within a year of such removal the county of former residence shall contribute to the poor relief of such person in the county to which he or she shall have moved, such absence from the county of former residence shall not be construed to be voluntary as that term is used in this Act."

The basic contention of the appellants is foreshadowed in the stipulation upon the trial, namely, that the aid received by the appellants, Milford Ankenbauer and Angelia Ankenbauer, from Burke county, was disbursed not from funds in the treasury of Burke county but from funds of the Federal Emergency Relief Administration. It is undis-

puted that Milford and Angelia Ankenbauer, up to November, 1932, were residents of Burke county within the purview of § 4, chapter 97, supra. It is also undisputed that at the time this proceeding was instituted they had been absent from that county for more than one year, but that they had not been absent from the county for more than one year without receiving aid from the funds allotted to Burke county by the Federal Emergency Relief Administration; and the great question in the case is whether the time they received such aid shall be excluded in determining the time of their absence from Burke county.

It is argued by the appellants that the aid received by Milford and Angelia Ankenbauer from the funds allotted to Burke county by the Federal Emergency Relief Administration does not constitute a contribution "to the poor relief of such persons" from Burke county within the purview of subsection 6, § 4, chap. 97, Laws 1933, and that, consequently, the time they received such aid should not be excluded in determining the time of their absence from Burke county.

In our opinion this contention is not well-founded.

In January, 1933, the Governor of North Dakota applied to the Reconstruction Finance Corporation under the Emergency Relief and Construction Act of 1932 for funds for relief purposes. That Act provided that "the Governor of any State or Territory may from time to time make application for funds," for the purpose of relief and work relief. It provided further that he *"shall certify the necessity for such funds and that the resources of the State or Territory, including moneys then available and which can be made available by the State or Territory, its political subdivisions, and private contributions, are inadequate to meet its relief needs."*

In January, 1933, the Governor appointed the State Emergency Relief Committee to supervise the expenditure for relief purposes of funds received from the Reconstruction Finance Corporation under the Emergency Relief and Construction Act of 1932, including the allotment of funds to the several counties of the state. Under the rules and regulations adopted the funds so received upon the Governor's application were to be allotted only to counties wherein the board of county commissioners made formal application and where such application was supported by showing made and duly certified to the State Emergency Relief Committee that the county was unable to meet the then demands upon

it for relief. During January or February, 1933, Burke county made application to the State Emergency Relief Committee for an allotment of funds. The application was granted. Funds at the disposal of the State Emergency Relief Committee were allotted. From that time forth, during all the time involved in this controversy, funds for relief purposes continued to be allotted to Burke county by the State Emergency Relief Committee.

On May 12, 1933, the Federal Emergency Relief Act of 1933 was approved, and after that Act went into effect the Federal funds made available for relief purposes in North Dakota were disbursed under the provisions of that Act. In the preamble of the latter act Congress declared "that the present economic depression has created a serious emergency due to widespread unemployment and increasing inadequacy of *state and local relief funds,* resulting in the existing or threatened deprivation of a considerable number of families and individuals of the necessities of life, and making it imperative that the Federal Government co-operate more effectively with the several States and Territories and the District of Columbia in furnishing *relief to their needy and distressed people."* That Act prescribed two different modes of administration of relief activities, financed with funds appropriated by Congress for relief purposes:—

1. It authorized the Federal Emergency Relief Administrator to assume control of the administration in any state or states where, in his judgment, more effective and efficient co-operation between the state and Federal authorities may thereby be secured in carrying out the purposes of the Act. Id. § 3 (b); U. S. C. A. title 15, § 723 (b).

2. It authorized the Administrator to make grants to the several states upon the application of a state made through its Governor.

All funds made available in North Dakota and all relief expenditures therein out of funds received from the Federal Government prior to March 1, 1934, were made under the second method, namely, upon grants made to the state. As regards grants to the state the Act provides:

"(a), Out of the funds of the Reconstruction Finance Corporation made available by this Act, the Administrator is authorized to make grants to the several States to aid in meeting the costs of furnishing *relief and work relief* and in relieving the hardship and suffering caused

by unemployment in the form of money, service, materials, and/or commodities to provide the necessities of life to persons in need as a result of the present emergency, and/or to their dependents, whether resident, transient, or homeless.

"(b) Of the amounts made available by this Act not to exceed $250,-000,000 shall be granted to the several States applying therefor, in the following manner: Each State shall be entitled to receive grants equal to one third of the amount expended by such State, including the civil subdivisions thereof, out of public moneys from all sources for the purposes set forth in subsection (a) of this section; and such grants shall be made quarterly, beginning with the second quarter in the calendar year 1933, and shall be made during any quarter upon the basis of such expenditures certified by the States to have been made during the preceding quarter.

"(c) The balance of the amounts made available by this Act, except the amount required for administrative expenditures under section 3, shall be used for grants to be made whenever, from an application presented by a State, *the Administrator finds that the combined moneys which can be made available within the State from all sources, supplemented by any moneys, available under subsection (b) of this section, will fall below the estimated needs within the State* for the purposes specified in subsection (a) of this section: Provided, That the administrator may certify out of the funds made available by this subsection additional grants to States applying therefor to aid needy persons who have no legal settlement in any one State or community, and to aid in assisting co-operative and self-help associations for the barter of goods and services.

"(d) After October 1, 1933, notwithstanding the provisions of subsection (b), the unexpended balance of the amounts available for the purposes of subsection (b), may, in the discretion of the Administrator and with the approval of the President, be available for grants under subsection (c). . . .

"Sec. 5. Any State desiring to obtain funds under this Act shall through its Governor make application therefor from time to time to the Administrator. Each application so made shall present in the manner requested by the Administrator information showing (1) *the amounts necessary to meet relief needs in the State during the period*

*covered by such application* and the amounts available from public or private sources within the State, its political subdivisions, and private agencies, *to meet the relief needs of the State,* (2) the provision made to assure adequate administrative supervision, (3) the provision made for suitable standards of relief, and (4) the purposes for which the funds requested will be used."

The State Emergency Relief Committee appointed by the Governor in January, 1933, continued to act as the agency within the State for the administration of relief activities under the Federal Emergency Relief Act of 1933, until March 1, 1934. The rules relating to allotment of funds for expenditure in the several counties remained the same, that is, it remained incumbent upon the county commissioners of the respective counties to make application to the State Emergency Relief Committee that funds granted to the state by the Federal Emergency Relief Administrator be made available for relief purposes in the particular county, and the county commissioners were required to make a showing, in support of the application, that the local funds were inadequate to meet the relief needs. In short, the funds of the Federal Emergency Relief Administration were not made available in any county unless and until the board of county commissioners of that county had made formal application and supported the application by showing that the relief requirements in that county could not be met and discharged out of the available local funds. It was not the purpose or intention that the Federal Government should take over the financing or administration of relief in any of the counties in North Dakota nor was there any taking over of any special or distinct function of relief activity. The Federal funds were intended to supplement the local relief funds where such funds were inadequate. The funds made available through the Federal Emergency Relief Administration were merely intended to add to the available relief funds of the county and to supplement the deficit existing in such funds.

On June 14, 1933, a conference of Governors and State Emergency Relief Administrators or their representatives, called and presided over by the Federal Emergency Relief Administrator, was held in Washington, D. C. Following the conference the governors and the state representatives gathered at the executive offices at the White House where they were addressed by the President. The President said in part:

"The Emergency Relief Act is an expression of the Federal Government's determination to co-operate with the States and local communities with regard to financing emergency relief work. It means just that. It is essential that the States and local units of government do their fair share. They must not expect the Federal Government to finance more than a reasonable proportion of the total."

Chapter 97, Laws 1933, must be construed so as to carry into effect the intent and purposes of the lawmakers as expressed therein. When that statute was enacted it was not contemplated that funds of the Federal Government would or might be made available as a grant to the state to supplement the relief funds of the several counties. The Emergency Relief and Construction Act of 1932 did not provide for grants. It provided for loans, either to municipalities or to the state. According to the provisions of chapter 97, Laws 1933, funds for the relief of persons in need of public aid must come out of the treasury of the several counties. Those were the only funds made available in this state for such purposes at that time. The provisions in subsections 4 and 6, § 4, chap. 97, Laws 1933, which provided that in determining the time required to establish residence in any county (so as to make a person in need of relief a charge of a certain county) the time the county of the former residence of such person should have contributed to the poor relief of such person in the county to which he or she had moved should be excluded in determining the time of residence, were intended to preclude the authorities of one county from relieving itself of a relief burden by furnishing aid to one of its relief charges while residing in another county until he had gained a residence in such latter county, and by such device relieve itself of a burden to the disadvantage of the latter county. If an indigent person, resident of one county, who removes to and becomes a resident of another county, may receive aid out of the funds allotted by the Federal Emergency Relief Administration for expenditure for relief purposes in the former county and have the time that he receives such aid included in the time required for acquiring a residence for poor relief purposes in the latter county, then the Federal funds that are allotted to supplement the local relief funds in the former county may in fact be used to defeat the purposes of the law under which county relief funds are required to be administered and expended. The funds made available by the Federal government under the Fed-

eral Emergency Relief Act of 1933 and allotted to any county in North Dakota became public funds to be expended for the relief of the destitute and needy residents of the particular county to which such funds were allotted, for the purpose and with the same effect as though the funds actually belonged to that county and were disbursed out of the county treasury. In principle it seems that no different result should follow because funds which had been allotted to the county to supplement local relief funds as a result of the application of the county commissioners were expended to relieve destitution under the supervision of an agency that had been accepted by the county commissioners as a part of a plan whereby the funds were made available for expenditure for relief purposes within the county than if funds in the county treasury had been expended by the county commissioners for like purposes. If these funds had actually been placed in the county treasury and expended by the county commissioners as overseers of the poor by warrant drawn on the treasury it would hardly be contended that the relief so extended did not fall within the proviso in subdivision 6, § 4, chapter 97, Laws 1933, or that a different result would follow as regards such residence because the funds so expended had not in fact been realized from taxes levied upon the taxpayers of Burke county. We see no distinction in principle between the situation assumed and the one that exists here. The moneys expended here were allotted to Burke county to supplement the local funds for relief purposes. They were expended under the direction and authority of a local agency (the County Emergency Relief Committee) established in that county, and that had been at least impliedly recognized by the county commissioners as authorized to expend such funds for appropriate relief purposes within the county. We see no valid reason why the same rule should not apply in determining a question of residence as regards an applicant for relief or a person likely to become a public charge in a case arising under chapter 97, Laws 1933, where such person has received aid from funds allotted for expenditure in that county by the State Emergency Relief Committee, and in a case where such person has received aid from funds in the county treasury. The reason for the rule in one case is as strong as in the other. The purposes for which the moneys were expended are precisely the same in both cases and the expenditure of the money was in the last analysis authorized or brought about by the same

governmental body. It is a maxim of our jurisprudence that when the reason is the same the rule should be the same. Comp. Laws 1913, § 7245.

The conclusion we have reached on the question involved here is in accord with the ruling of the Attorney General on the same question. The judgment appealed from is correct and must be affirmed. It is so ordered.

BURR, Ch. J., and MOELLRING, NUESSLE and BURKE, JJ., concur.